UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

VANESSA ALCORN,

        Plaintiff,

        v.                    Case No. 19-C-674

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER AFFIRMING DECISION OF COMMISSIONER

---

Plaintiff Vanessa Alcorn filed this action for judicial review of a decision by the Commissioner of Social Security denying her applications for a period of disability and disability insurance benefits and supplemental security income under Titles II and XIV of the Social Security Act. Plaintiff challenges the Administrative Law Judge's (ALJ) determination of her mental residual functional capacity (RFC) and the methodology used by the vocational expert to estimate the number of available jobs Plaintiff could perform based on the RFC. For the reasons that follow, the decision of the Commissioner will be affirmed.

### BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and an application for supplemental security income on April 2, 2015. R. 15. In these applications, Plaintiff alleged disability beginning on June 5, 2011; she later amended her onset date to December 17, 2014, to account for the res judicata effect of a previous denial. R. 15, 46–47. In her disability report, Plaintiff listed the following physical or mental conditions that limited her ability to work: bipolar, anxiety, ADD, migraine, back problems, right leg amputation, and

arthritis. R. 349. After her applications were denied initially and on reconsideration, Plaintiff requested a hearing before an ALJ. On October 18, 2017, ALJ Jeffrey Gauthier conducted a video hearing where Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. R. 39.

At the time of the hearing, Plaintiff was 34 years old and lived with her son and her girlfriend of 13 years. R. 48–50. Plaintiff testified she graduated from high school and attended cosmetology school while a junior and senior in high school. R. 52. She said she failed to obtain her cosmetology license, trying three times to do so. R. 52–53. Plaintiff has not received any other education. R. 53.

Plaintiff testified that since her alleged onset date, December 17, 2014, she has not held any job. *Id*. During 2006 and 2007, Plaintiff worked in a laundromat but the work was closer to part-time than full-time. R. 54–55. At this job, Plaintiff said she worked as a laundress, cleaning customers' laundry and working as a cashier. R. 56. Plaintiff said this job required her to spend most of the day on her feet and lift bags of laundry that weighed approximately 20 pounds. R. 56–57. That was the extent of Plaintiff's testimony concerning her employment history.

Plaintiff described her physical and mental symptoms as being equally significant. R. 58. She fractured her lower leg in a fall, and it failed to heal properly. R. 59. In November 2013, after a series of unsuccessful surgeries, an amputation of between 12 and 18 inches of her lower leg was performed. R. 60. Plaintiff was fitted with a prosthetic and testified to the difficulties she had adjusting to it, maintaining a proper fit and the pain she experienced. R. 61–72. Plaintiff has also developed arthritis in her left knee. Because she is not challenging the ALJ's assessment of her physical impairments, it is not necessary to address them further. Plaintiff agreed that the label of a K-3 amputee—which describes a person "who has the ability or potential for ambulation with

variable cadence, typical of a community ambulator who has the ability to traverse most environmental barriers"—is an accurate description for her. R. 63.

Plaintiff also testified about her mental health. She testified she has suffered from anxiety and panic attack disorder for at least twelve years. R. 76–77. Plaintiff said she takes medication and sees a psychiatrist but does not go to regular counseling for her anxiety and panic attacks. R. 77–78. When she has a panic attack, she feels like she is going to die and applies an ice pack on her neck and tries to control her breathing. R. 79.

Plaintiff testified that she has severe anger issues and attention deficit disorder. R. 80–81. Plaintiff stated that her anger can be triggered by "pretty much anything" and specifically mentioned police officers, owners, managers, and, generally, people in authority. R. 91–92. Plaintiff said she has between 7 and 12 outbursts of anger per day. R. 93. Plaintiff said she takes medication for her ADD and that, even if she did not have her other symptoms, her ADD by itself would prevent her from working because she cannot concentrate. R. 81. Plaintiff also testified she has bipolar disorder and depression; she takes medication for the bipolar disorder. R. 82.

During a normal week, Plaintiff said she leaves the house twice a week to go to the grocery store, Walgreens, or her doctors' offices. R. 83. Plaintiff discussed occasionally leaving the home for dinner. R. 84. Most of her day, Plaintiff said, is spent watching television; she does not read or have other hobbies. R. 84–85.

In a thirteen-page decision dated May 4, 2018, the ALJ concluded Plaintiff is not disabled. R. 12–27. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 17, 2014. R. 18. At step two, the ALJ determined that Plaintiff had the following severe impairments: right below the knee

amputation, left knee osteoarthritis, obesity, anxiety disorder, affective disorder, and attention deficit hyperactivity disorder (ADHD). *Id*. At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 19.

Next, the ALJ assessed Plaintiff's residual functional capacity (RFC). He found that Plaintiff had the RFC to perform sedentary work except that:

> she has additional limitations. She can never operate foot controls with the right foot. The claimant can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally kneel and crouch, and never crawl. She can never work at unprotected heights and never around moving mechanical parts. With regard to understanding, remembering and carrying out instructions, the claimant can perform simple, routine, and repetitive tasks, but not at a production-rate pace (e.g., assembly line work). With regard to the use of judgment in the workplace, she can make simple, work-related decisions. The claimant is capable of frequently interacting with supervisors and co-workers and occasional interacting with the public. The claimant is limited to tolerating occasional changes in a routine work setting.

R. 21. During the hearing, the ALJ posed a hypothetical question to the VE, asking whether an individual (similar to Plaintiff in age, education, and work experience) with the restrictions outlined by the RFC would be able to perform the relevant past work that Plaintiff had performed. R. 96–97. The VE testified that Plaintiff would be able to work in jobs available in the national economy, including as a hand packager, accounting clerk, or general office clerk. R. 97–98. At step four, the ALJ found that Plaintiff had no past relevant work. R. 26. However, relying on the testimony of the VE, the ALJ concluded at step five that Plaintiff could perform work that existed in significant numbers in the national economy. R. 27.

The ALJ concluded that Plaintiff was not disabled. *Id*. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1.

4

## LEGAL STANDARD

A claimant is entitled to disability benefits under Title II of the Social Security Act if she became disabled before the date she was last insured. 42 U.S.C. § 423(a)(1). To receive SSI under Title XVI of the Social Security Act, a claimant must be disabled and have limited means. 42 U.S.C. §§ 1381(a), 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence does not exist that allows one to distinguish those impairments that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the

Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. RFC and Hypothetical Question

#### 1. Concentration, Persistence or Pace

Plaintiff claims that the ALJ erred in formulating her RFC and the hypothetical question he posed to the VE at step five of the sequential evaluation. More specifically, Plaintiff's principal claim is that the ALJ failed to account for all of the non-exertional limitations that resulted from her mental impairments in the area of concentration, persistence or pace (CPP). This is a recurring

7

issue in judicial review of social security cases. *See, e.g.*, *DeCamp v. Berryhill*, 950 F.3d 369 (7th Cir. 2020); *Martin v. Saul*, 950 F.3d 369, 373–74 (7th Cir. 2020).

A claimant's RFC is intended to represent the most that a claimant can still do despite the limitations caused by her physical and mental impairments. 20 C.F.R. § 404.1545(a)(1). The ALJ determines a claimant's RFC "based on all the relevant evidence" in the record, including severe and non-severe impairments as well as medical and non-medical evidence. § 404.1545(a), (e). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citing *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010); *Indoranto v. Barnhart*, 374 F.3d 470, 473–74 (7th Cir. 2004)). It is important to note, however, that when a case goes to an administrative hearing, it is the ALJ who is responsible for determining a claimant's RFC. 20 C.F.R. § 404.1546(c).

In determining Plaintiff's RFC in this case, the ALJ gave great weight to the opinions of state agency reviewing psychologists Susan Donahoo, Psy.D., and Jan Jacobson, Ph.D., who completed the standard agency reports based on their review of the entire record. On the Psychiatric Review Technique (PRT), both Drs. Donahoo and Jacobson found that Plaintiff had moderate difficulties in maintaining social function and in maintaining concentration, persistence, or pace. R. 140, 173. As a result of these findings, both concluded that the more detailed evaluation of Plaintiff's mental RFC was needed. 20 C.F.R. § 1520a(d)(3). Each then completed a mental RFC, or MRFC, to document their opinions based on their review of the record.

The MRFC is a form the agency uses to document its assessment of a claimant's mental RFC. The form, in the version used here, lists a series of questions intended to address the claimant's ability to perform various work activities. For each functional area, the reviewing

8

psychologist is asked if the individual has any limitations. Follow-up questions then ask the reviewer to rate the individual's limitations as to various activities within that functional area. The Social Security Administration's Program Operations Manual System (POMS) lists the ratings to be used and what they are intended to mean. The ratings are: "not significantly limited," which means "the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity;" "moderately limited," which means "the individual's capacity to perform the activity is impaired;" and "markedly limited," which means the individual cannot usefully perform or sustain the activity." The reviewer can also indicate that there is no allegation of a limitation or that the evidence is insufficient. When the activity is rated "moderately limited," the degree and extent of the capacity or limitation must be described in narrative form in another section of the MRFC. POMS DI 24510.063, SOCIAL SECURITY, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510063 (last visited Nov. 22, 2020).

Unfortunately, Dr. Donahoo's MRFC is not as clear as one would hope. While she rated the various activities within the broad functional areas, Dr. Donahoo failed to provide a clear statement of her opinion of the degree and extent of Plaintiff's capacity or limitation as to those activities that she rated "moderately limited." R. 144–46. For example, Dr. Donahoo answered "yes" to the question "Does the individual have understanding and memory limitations?", and rated Plaintiff's ability to understand and remember detailed instructions "moderately limited." R. 144. But in the space where she was to explain in narrative form the presence and degree of specific understanding and memory, Dr. Donahoo wrote: "[claimant complains of] difficulty following instructions [because] of difficulty remembering or she loses track." *Id.* She continued, "MER has indicated the clmt is a/o w/ nml short-term and remote memory. MER does not indicate significant memory problems." *Id.* The court presumes Dr. Donahoo was saying that the medical

9

evidence of record indicated the claimant is at or within normal limits for short-term and remote memory, but the court could be mistaken and it should not have to presume. Given the importance of the opinions of state agency consultants for judicial review, their reports should be at least clearly written. The more serious defect in the report, however, is that Dr. Donahoo failed to clearly state her own opinion as to Plaintiff's capacities and limitations in understanding and memory, which is what she was presumably paid to provide. She tells us that the "MER does not indicate significant memory problems," but fails to state in narrative form what Plaintiff's functional capacity is in that area.

Dr. Donahoo's response to questions concerning Plaintiff's "sustained concentration and persistence limitations" is even less helpful. Dr. Donahoo rated as "moderately limited" Plaintiff's "ability to maintain attention and concentration for extended periods," her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," her "ability to work in coordination with or in proximity to others without being distracted by them," and her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." R. 145. Yet, in the section of the report where she was asked to explain in narrative form Plaintiff's sustained concentration and persistence capacities and/or limitations, Dr. Donahoo simply repeated her statement that the MER indicates claimant is at or within normal limits for short-term and remote memory, does not indicate significant memory problems and then recounted Plaintiff's complaints about her memory and concentration problems. *Id.* Dr. Donahoo's responses in the other sections of the form calling for a narrative response were likewise unhelpful. She simply repeated Plaintiff's complaints and referred to the MER without stating her own opinion.

10

Dr. Jacobson's MRFC is a significant improvement. Dr. Jacobson gave the same "moderately limited" rating as Dr. Donahoo to "understanding and memory" and "sustained concentration and persistence" limitations. But unlike Dr. Donahoo, Dr. Jacobson provided in narrative form her opinion as to the capacities and limitations Plaintiff retained. With respect to her understanding and memory limitations, Dr. Jacobson opined that Plaintiff was "able to understand and remember simple instructions." R. 178. As for her sustained concentration and persistence limitations, Dr. Jacobson explained that Plaintiff was "able to sustain attention for simple, repetitive tasks for extended periods of two hour segments over the course of a routine workday/workweek within acceptable attention, concentration, persistence and pace tolerances." *Id.* She was unable to do so, Dr. Jacobson thought, "for moderately detailed/complex tasks requiring sustained attention." *Id.*

Stating he was giving the opinions of Drs. Donahoo and Jacobson "great weight," the ALJ concluded as part of the RFC that Plaintiff could "perform simple, routine, and repetitive tasks, but not at a production-rate pace (e.g., assembly line work)." R. 21, 25. The ALJ also concluded she could "make simple, work-related decisions" and that she was "capable of frequently interacting with supervisors and co-workers and occasional interacting with the public." R. 21. Finally, the ALJ concluded that Plaintiff was "limited to tolerating occasional changes in a routine work setting." *Id.* Plaintiff argues that these limitations fail to capture the limitations set forth in the MRFC reports completed by Drs. Donahoo and Jacobson.

In support of her argument, Plaintiff cites *DeCamp*, wherein the Court held that the ALJ erred in limiting the claimant "to 'unskilled work' with no 'fast-paced production line or tandem tasks,'" as set forth in the narrative section of the state agency consultants' reports, notwithstanding their rating as "moderately limited" the claimant's ability to maintain attention and concentration

11

for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination or proximity to others without being distracted; and complete a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace. 916 F.3d at 675. In so ruling, the Court rejected the Commissioner's argument that the ALJ had accounted for the claimant's limitations by relying on the sections of the form where, according to the instructions, "the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion." R. 144. The POMS instructs reviewing consultants that the sheet containing the list of activities they are to rate "**is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." POMS DI 24510.060 (bold in original); *see also Smith v. Comm'r of Social Sec.*, 631 F.3d 632, 637 (3d Cir. 2010) ("Because Smith cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that the hypothetical question was deficient, his argument is without merit as it pertains to Dr. Tan and Dr. Graff."). Notwithstanding these instructions, however, the Seventh Circuit has held that the worksheet ratings cannot be ignored but constitute medical findings that must be incorporated into the mental RFC. *See Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) ("This circuit has declined to adopt a blanket rule that checked boxes in Section I of the MRFCA form indicating moderate difficulties in mental functioning need not be incorporated into a hypothetical to the VE."); *DeCamp*, 916 F.3d at 676 ("But even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized

12

forms such as the PRT and MRFC forms."). Plaintiff argues that the ALJ erred in failing to incorporate the "additional findings" in the RFC and hypothetical question.

More recently, in *Martin*, the Seventh Circuit emphasized that "the law does not require ALJs to use certain words, or refrain from using others, to describe the pace at which a claimant is able to work." 950 F.3d at 374. The same is true of the other functional areas. As the court explained in *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019), "[a]s a matter of form, the ALJ need not put the questions to the VE in specific terms—there is no magic words requirement. As a matter of substance, however, the ALJ must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." *Id.* at 570 (quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *DeCamp*, 916 F.3d at 675–76). In *Martin*, the ALJ found that the claimant could "work in a job involving only simple tasks with low stress, occasional changes, a flexible pace, and superficial interactions with others." 950 F.3d at 372. The court provided the following explanation of how the RFC assessed by the ALJ adequately accounted for the claimant's functional limitations in CPP:

> Start with concentration. The second ALJ found that "[Martin] could maintain the concentration required to perform simple tasks, remember simple work-like procedures, and make simple work-related decisions." Moving to persistence, the ALJ, in defining and tailoring the RFC, further determined that Martin could stay on-task and thereby "meet production requirements." Of course, even if someone is on-task, it is still possible she may operate at such a slow pace that an employer would not find her work satisfactory. Hence, the second "P"—pace—must enter the equation. The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented. Ideally, the ALJ would have brought to the surface what is surely implicit in the determination—that any pace-based goals must be reasonable as a way of signaling that the employer could not set the bar beyond the person's functional reach. We take comfort here from the fact that the jobs the vocational expert suggested inherently reflected such a reasonableness limitation. Although Martin complains that the pace requirements are too vague, there is only so much specificity possible in crafting an RFC. The law required no more.

*Id.* at 374.

13

The same analysis applies here. Beginning with concentration, the ALJ found that Plaintiff "can perform simple, routine, and repetitive tasks." R. 21. This is consistent with the findings of Drs. Donahoo and Jacobson that Plaintiff's "ability to understand and remember very short and simple instructions" was "not significantly limited," meaning "the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity." *See* POMS DI 24510.063. Both psychologists likewise concluded that Plaintiff's "ability to carry out very short and simple instructions" was "not significantly limited," as was her "ability to sustain an ordinary routine without special supervision" and her "ability to make simple work-related decisions." R. 144–45, 177–78. But Dr. Jacobson went further. She concluded that as long as Plaintiff was limited to simple, routine and repetitive tasks, she would be able to sustain attention "for extended two-hour segments over the course of a routine workday/workweek within acceptable attention, concentration, persistence and pace tolerances." R. 178. She would be unable to do so, Dr. Jacobson opined, "for moderately detailed/complex tasks requiring sustained attention." *Id.* To these limitations, the ALJ added that Plaintiff could not work at a "production-rate pace" and gave as an example assembly line work.

The ALJ did not err by incorporating into the RFC and hypothetical question the CPP capacities and limitations that Dr. Jacobson found Plaintiff had as a result of her mental impairments. Plaintiff does not challenge Dr. Jacobson's opinion; only the ALJ's incorporation of it into her RFC. Dr. Jacobson found that as long as Plaintiff was limited to simple, repetitive, and routine tasks, she would be able to persist in her work throughout a full workday and workweek at an acceptable pace. Given this evidence, the ALJ's RFC was not unreasonable. "Even generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account

14

for the claimant's demonstrated psychological symptoms' found in the record." *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) (quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)).

The ALJ also did not err by adding a limitation on the pace of work to be performed under the RFC to make sure it did not exceed Plaintiff's capacity. The limitation added by the ALJ responds to the courts' repeated statements that limiting a claimant to simple, routine, and repetitive work will not usually capture all of the limitations of mental impairments that result in moderate difficulties in CPP. Of course, here the state agency consultant addressed that issue but that does not mean an ALJ may not add a limitation in order to adopt a conservative approach. An ALJ does not err by adding limitations that are more restrictive than the functional work-related limitations identified by the state agency doctors. *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019). Accordingly, the ALJ reasonably accounted for Plaintiff's CPP limitations in the RFC and hypothetical question posed to the VE. Substantial evidence supports his assessment.

**2. Social Interaction**

Plaintiff also contends that the ALJ erred in failing to properly account for the limitations Dr. Jacobson found Plaintiff had in social interactions. Like Dr. Donahoo, Dr. Jacobson thought that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and in her ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes. R. 145, 178–79. But whereas Dr. Donahoo thought that Plaintiff was moderately limited in her ability to interact appropriately with the public, Dr. Jacobson opined that she was "markedly limited" in that area. In the narrative section describing Plaintiff's social interaction capacities and/or limitations, Dr. Jacobson wrote: "Claimant is able to sustain the minimum social demands of simple task settings, including relating

15

infrequently to coworkers, supervisors within the above parameters. C[laiman]t is not able to deal directly with the public." R. 179. Dr. Donahoo, on the other hand, wrote in the narrative section of her MRFC for social interaction capacities and/or limitations: "On the ADL form the clmt c/o difficulty getting along w/ others. MER does not indicate the clmt has difficulty interacting appropriately w/ medical or MH providers," R. 146, suggesting that her difficulties were not severe.

Without resolving the apparent dispute, the ALJ did not include Dr. Jacobson's limitations in his RFC. Instead of adopting Dr. Jacobson's conclusions that Plaintiff is able to relate infrequently with coworkers and supervisors but unable to deal directly with the public, the ALJ concluded that Plaintiff "is capable of frequently interacting with supervisors and co-workers and occasional interacting with the public." R. 21. Plaintiff contends that the ALJ erred in failing to incorporate Dr. Jacobson's opinion on this activity into the RFC and hypothetical question posed to the VE.

As noted above, however, when a case proceeds to an administrative hearing, it is the responsibility of the ALJ, not the state agency consultant, to assess the claimant's RFC. 20 C.F.R. § 404.1546(c). Moreover, while the ALJ in this case stated he placed "great weight" on the opinions of Drs. Donahoo and Jacobson (R. 25), he did not say he adopted them in full. As noted above, the ALJ added a limitation to address Plaintiff's deficiencies in pace that neither state consultant recommended, and the two consultants disagreed in their ratings of Plaintiff's ability to deal with the public. Notwithstanding Dr. Jacobson's opinion that Plaintiff was markedly limited in her ability to interact appropriately with the general public, the ALJ found otherwise and cited evidence as to why. The ALJ cited Dr. Donahoo's MRFC in which she found that Plaintiff's ability to interact appropriately with the general public was only moderately limited, noting that

16

the record did not show she had difficulty interacting appropriately with medical and mental health providers. R. 145–46. The ALJ also cited several exhibits indicating that Plaintiff "regularly maintains appropriate eye contact" (R. 20), her improvement with medication (R. 25), and multiple reports showing a normal mental status exam. R. 24. A consultative examiner noted Plaintiff's "mood level reflected underlying anger and hostility" (*id.*), but offered no opinion suggesting that she was *unable* to appropriately deal with the public. To the contrary, the examiner noted Plaintiff was "cleanly dressed, polite, gave appropriate answers, maintained good eye contact, and spoke in a normal tone of voice." *Id.* Considered in its totality, this amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154. In other words, substantial evidence also supports the ALJ's assessment of Plaintiff's RFC in the area of social interaction. But even if it did not, the result would be the same.

The Commissioner argues, however, that any error as to this issue was harmless. In support of his argument, the Commissioner cites to the transcript of the hearing before the ALJ where Plaintiff's attorney questioned the VE about the more restrictive limitations Dr. Jacobson had found. The pertinent section of the transcript reads as follows:

> Q. Very briefly, Mr. Entwisle if you were to take the initial hypothetical but change the—some of the mental limitations such that we would have no contact with the general public and only brief and superficial contact with coworkers and supervisors, and I would define that as less than 10% of the time, would the jobs that you identified under the—hypothetical #1, would those jobs remain available?
>
> A. They would. I mean I'm trying to focus on jobs where the person is kind of working independently and they're not working in a team. They have a specific job and they continue to do it on a regular and ongoing basis. If you're speaking to the level of jobs where say someone is essentially working in complete isolation, there's only four jobs within the whole DOT where someone works in complete isolation and those are all semiskilled jobs.
>
> Q. Okay. But that would—that would be work in complete isolation with no contact with coworkers and supervisors?

17

A. That's correct.

Q. Would there be an erosion of the vocational base of the jobs that you've identified with no contact with the general public and only brief and superficial contact with coworkers and supervisors?

A. Not at 10%, no.

R. 101.

Based on this series of questions and answers, the Commissioner argues that any error by the ALJ was harmless since, even with the additional limitations Dr. Jacobson found, the same number of jobs remained within Plaintiff's RFC. The court agrees that based on the testimony of the VE, any error is harmless. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result. . . . That would be a waste of time and resources for both the Commissioner and the claimant." (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010))). Moreover, because Plaintiff has not responded to the Commissioner's argument that the error is harmless, the issue is waived. *Cheshier v. Bowen*, 831 F.2d 687, 689 (7th Cir. 1987).

**B. Vocational Expert's Methodology**

Lastly, Plaintiff challenges the methodology used by the VE to estimate the number of jobs that someone with Plaintiff's RFC could perform. "[A]ny method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability." *Chavez v. Berryhill*, 895 F.3d 962, 969 (7th Cir. 2018). In other words, the job estimate must be supported by substantial evidence. *Id.* at 967–68.

Plaintiff filed an objection to the VE's qualifications and methodology prior to the hearing without even knowing who the VE would be or what methodology he or she would use. The ALJ advised counsel that when they got to that part of the hearing and counsel had more specific

18

objections to the specific VE who testified, the ALJ would entertain them at that time. R. 42–43. However, when the VE was called to testify, counsel declined the opportunity to voir dire him and offered no objection to his qualifications. R. 96. The ALJ addressed the objection further in his written decision:

> Counsel objected to the vocational expert's testimony based upon his qualifications, methodology, and source materials, arguing that he did not believe the vocational expert's testimony would be based on a proper foundation (Exhibit B18E). The objection is overruled. The undersigned finds the vocational expert, Mr. Entwisle, is qualified to provide job numbers based upon his education and experience per his testimony and resume on file, the Agency's certification of Mr. Entwisle as qualified to testify at Agency hearings regarding vocational information, his persuasive description of his methodology and resources, and the absence of any reviewing tribunal that has found Mr. Entwisle or his methodology to be wanting. Additionally, because the objections were made prior to the hearing, they are general in nature and lacking in specificity.

R. 16.

Plaintiff argues that filing a written objection weeks before the hearing is sufficient to preserve his challenge to the VE's methodology. But having stipulated to the VE's qualifications and failing to inquire into the source of the information the VE offered and the methodology he used when given the opportunity to do so, Plaintiff has forfeited any argument that the VE's testimony was improper. Testimony by a VE that is unchallenged by a represented Plaintiff constitutes substantial evidence. *Biestek*, 139 S. Ct. at 1155–56. Plaintiff forfeited her challenge to the methodology by failing to challenge it at the hearing and objecting to its admissibility. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) ("Brown also forfeited her argument regarding the vocational expert's testimony about the number of positions for each of the six jobs by failing to object during the hearing."); *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (claimant forfeited argument regarding reliability of data underlying vocational experts' job-numbers

19

opinions by failing to object during hearing); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (same).  As a result, this claim fails as well.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.  The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of November, 2020.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge